UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR. NO. 06 - 026 - 03 (CKK) |
| | ) | |
| | ) | |
| THELMA LEONARD | ) | |

**DEFENDANT THELMA LEONARD'S MOTION TO SUPPRESS STATEMENTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

COMES NOW the defendant, Thelma Leonard, through undersigned counsel, pursuant to the Fifth and Sixth Amendments of the United States Constitution, and respectfully moves this Court to suppress as evidence against her any and all statements allegedly made to prosecutors and/or law enforcement officers, and to the grand jury on or about July 26, 2005. As grounds for this motion Defendant, upon information and belief, states as follows:

1. Peter Turner, LaTanya Andrews, and Thelma Leonard are charged with conspiring between on or about December 8, 2000 and January 10, 2006 to fraudulently obtain money from the FEGLI program, a group term life insurance program established by the government, in violation of 18 U.S.C. 371. In addition, co-defendants Peter Turner and LaTanya Andrews are each charged with one count of bribery in violation of 18 U.S.C. 201.

2. Vester Mayo was an employee at the the Department of Veterans Affairs Medical Center ("DVMAC"), who participated in the FEGLI program. On or about December 8, 2000, Ms. Mayo suffered a stroke and was hospitalized, where she remained until her death on or about December 20, 2000.

2

3. The indictment alleges that sometime on or after December 8, 2000, Mr. Turner caused the signatures of Ms. Mayo and a DVAMC official to be forged on a Designation of Beneficiary form making him a 50% beneficiary, and that Ms. Andrews caused the form to be placed in Ms. Mayo's official personnel file. On or about January 10, 2001, Mr. Turner submitted an official claim form seeking payment of benefits under the FEGLI program, and on or about January 20, 2001, the Insurance Carrier paid the claim to Mr. Turner.

4. The government's theory as to Ms. Leonard appears to be that between December 8, 2000 and January 2001, while Vester Mayo was either incapacitated or deceased, she and her husband conspired with Mr. Turner - fraudulently signing as witnesses on the FEGLI designation of beneficiary form, which Mr. Turner then had Ms. Andrews insert in Ms. Mayo's official personnel file. The indictment also alleges that in July 2002, a $1,000 personal check was paid by Mr. Turner to Ms. Leonard's husband in furtherance of the conspiracy, and that Ms. Leonard benefitted from that payment because it was deposited in a checking account held jointly by Mr. and Ms. Leonard.

5. After Vester Mayo's death, her mother questioned the validity of the Designation of Beneficiary form making Peter Turner a 50% beneficiary for the FEGLI life insurance benefits. An investigation was undertaken by the Department of Veterans Affairs and by the Office of Personnel Management. According to the government, the investigation revealed that Ms. Mayo's signature and another signature on the FEGLI Designation of Beneficiary form were forged, and that the form was fraudulently placed in Ms. Mayo's personnel file. The Designation of Beneficiary form requires the signatures of two witnesses. Ms. Mayo's form bears the signatures of Thelma Leonard and her husband.

3

6. On or about October 13, 2004, Ms. Leonard was subpoenaed to appear before the grand jury investigating the allegations of fraud. On or about October 18, 2004, Ms. Leonard was contacted by prosecutors and law enforcement officers and interviewed over the telephone in lieu of her scheduled grand jury appearance.

7. According to the government, Ms. Leonard made statements admitting that the signature on the form appeared to be hers; that she recalls signing a form like that years ago in Vester Mayo's presence, believing she was doing a favor for her husband's friends because they were buying a house and wanted insurance; indicating that she signed the form long before Ms. Mayo was hospitalized in December 2000; and denying any knowledge of any payment by Peter Turner in exchange for signing the form. Following that interview, Ms. Leonard was advised that she did not have to appear before the grand jury pursuant to that subpoena.

8. In or about July 2005, Ms. Leonard was again subpoenaed to appear before the grand jury investigating the allegations of fraud in this matter. At that time, the government agents were well aware that the signature of Thelma Leonard appeared on the questioned Designation of Beneficiary form, purporting to witness the signature of Vester Mayo - a signature the government had already decided was forged. In addition, the government had obtained a copy of the $1,000 check paid by Mr. Turner to Ms. Leonard's husband, which had been deposited into their joint checking account, which they believe to have been paid in furtherance of the alleged conspiracy. Thus, prior to Ms. Leonard's appearance at the grand jury, the government had sufficient evidence to establish probable cause to believe that Ms. Leonard was involved in a conspiracy to defraud. The criminal investigation had reached the grand jury stage, and Ms. Leonard was clearly in the government's sights as a target. Nevertheless, the government agents

4

did not give Ms. Leonard the customary "target" warnings when she appeared on July 26, 2005, in response to the grand jury subpoena. Instead, the prosecutor and agents met briefly with Ms. Leonard outside the grand jury room, and she was specifically advised that she was not a target; that the government was not interested in her; that they wanted her to cooperate and testify before the grand jury; and that if she told the truth she would have nothing to worry about - which Ms. Leonard understood to mean she would not be prosecuted.

9. Based on the government's representations to her, Ms. Leonard thereafter testified before the grand jury on July 26, 2005.[1] The government already knew what she could say based on the October 2004 interview. She reasonably believed that if she cooperated with the government and testified before the grand jury she would not be prosecuted. Her testimony was largely consistent with her statement to the government in October 2004.

10. Nevertheless, the government indicted Ms. Leonard, relying, at least in part, on the uncounseled statements she made to law enforcement officers and to the grand jury. Defendant submits that implied informal immunity was conferred based on the dealings between Ms. Leonard and the prosecutors and investigators in the case.

11. The doctrine of "equitable immunity" is recognized to imply immunity under circumstances when it is reasonable to assume that a defendant was being promised informal immunity. See eg., United States v. Carter, 454 F.2d 426, 427-28 (4th Cir. 1996), *cert. denied* 520 U.S. 933 (1974)(en banc); United States v. Plummer, 941 F.2d 799, 803-05 (9th Cir. 1991); Rowe

---

[1] Eventually, in December 2005, a "target" letter was sent to Ms. Leonard, offering her another opportunity to testify before the grand jury. During the telephone conversation following that letter, Ms. Leonard indicated that she was going to contact an attorney. Thus it seems evident that Ms. Leonard would have exercised her 5th and 6th Amendment rights if she had been properly warned of her target or subject status prior to her July 2005 grand jury appearance.

5

v. Griffin, 497 F. Supp 610 (M.D. Ala. 1980), *aff'd* 676 F.2d 524 (11th Cir. 1982). Defendant submits that her decision to answer questions and testify in reliance on the government's explicit representations that she would have nothing to worry about was reasonable, and that the course of dealings therefore conferred immunity regarding her statements.[2] Therefore, the government should be precluded from using those statements against Ms. Leonard, or any evidence derived from those statements, at her trial.  See, Kastigar v. United States, 406 U.S. 441 (1972).

12.  Even if the statements are not considered the product of an implied immunity agreement, the government should be precluded from using those statements at trial because they were taken in violation of her right against compelled self incrimination under the Fifth Amendment.  "The Fifth Amendment, in relevant part, provides that no person 'shall be compelled in any criminal case to be a witness against himself.' It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" Minnesota v. Murphy, 465 U.S. 420, 426 (1984), *citing* Leftkowitz v. Turley, 414 U.S. 70, 77 (1973).   "The privilege against self-incrimination

---

[2] The doctrine of equitable immunity is particularly appropriate because the equities of the situation, as well as principles of fairness and due process, require the result. Ms. Leonard has suffered from a serious medical condition, Sarcoidosis, since at least the mid 1990s.  She was forced to leave her job in 1995 due to disability.  She has been on medications and has suffered a great deal over the past ten years.  Her memory has been affected by her medical condition, and by the medications she has been required to take.  When she was contacted about the investigation in this case she was being asked to remember events that occurred 4 to 5 years earlier.  She was clearly a suspect and should have had an opportunity to consult with counsel to assure that her 5th Amendment rights were not violated. Her statements were simply not voluntary or reliable under the totality of the circumstances.

6

guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants." United States v. Verdugo-Urquidez, 494 U.S. 259, 264 (1990). The Court has long recognized that statements obtained under coercive circumstances are deemed involuntary, and can not be used in any subsequent criminal trial. See, Chavez v. Martinez, 538 U.S. 760, 769 (19  ); Oregon v. Elstad, 470 U.S. 298, 307-08 (1085). The test is whether, considering the totality of the circumstances, the free will of the witness was overborne. United States v. Washington, 431 U.S. 181, 188 (1977).

    13. The Supreme Court has not directly addressed whether statements compelled by the grand jury are coercive, and therefore involuntary. See, United States v. Washington, Supra at 186. The general rule appears to be that if a grand jury witness does not assert the privilege, the witness will not be considered to have been compelled within the meaning of the 5th Amendment. See. Minnesota v. Murphy, 465 U.S. 420, 426, *citing*, United States v. Monia, 317 U.S. 424, 427 (1943). However, the Court has suggested that sometimes "the usual rule might give way in situations where the government has 'substantial reason to believe that the requested disclosures are likely to be incriminating.'" Minnesota v. Murphy, Supra at 128, *citing,* Roberts v. United States, 445 U.S. 552, 559 (1980). Thus under the circumstances in this case, Ms. Leonard submits that the statements to the grand jury were compelled within the meaning of the 5th Amendment, and that they should be suppressed.

    14. Defendant submits that the argument advanced in Washington, Supra, still applies - "a grand jury inquiry is an 'interrogation of persons suspected or accused of crime (that) contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" Washington, Supra at 186,

7

*citing,* Miranda v. Arizona, 384 U.S. 436 (1966). Ms. Leonard submits that the government's dealings with her created a very coercive situation. She had previously told the government in October 2004 that she did not want to appear before the grand jury. When the agents attempted to serve the subpoena, she was not at home and her family members provided her cell number to the agents. In spite of her efforts to make herself available for service, the agents became frustrated by the delays and threatened to "take other measures" - ie. have her arrested if she was not home to receive the subpoena the next time. Thus when she appeared at the grand jury on July 26, 2005, the environment was already very coercive to her.

15. When she appeared pursuant to the grand jury subpoena, the prosecutors and agents advised her that she was not a target, and that she did not have anything to worry about as long as she told the truth.[3] Perhaps the most telling factor which demonstrates the coercive nature of the government's approach in this case is the fact that the government had incriminating information which they first inquired about during her testimony before the grand jury, including the $1,000 check from Peter Turner payable to Marvin Leonard, her husband, dated July 2002.

16. In effect, she was in a no-win situation, which had to be plainly obvious to the government. The government clearly had probable cause to charge Ms. Leonard for her alleged involvement in the conspiracy to commit fraud. The government did not believe that her October 2004 statements were accurate and/or truthful. Yet she was told that she was not a target, and that she simply had to tell the truth and she would have nothing to worry about. It had to be obvious to the government agents that if she testified consistent with the statements she made to

---

[3] It is worth noting that the government had already interviewed her at length in October 2004, and knew what her general recollections were. She was not re-interviewed about the facts before she was compelled to testify before the grand jury.

8

the government in October 2004, she would be indicted in any event. Thus she had to be considered a target at that point. Yet she was not re-interviewed and was not given target warnings, in spite of the fact that internal Department of Justice policies seem to have called for target warnings prior to her grand jury appearance. If those warnings had been given, Ms. Leonard would have sought legal advice, and the result would have been a knowing, intelligent exercise of her 5th and 6th Amendment rights.

17. Ms. Leonard further contends that the standard 5th and 6th Amendment warnings read to her during the beginning of her grand jury testimony did not overcome the coercive nature of the proceedings as a whole, particularly in light of the repeated non-target assertions by the government immediately before her testimony. Thus Ms. Leonard's 5th Amendment rights were violated in this case.

18. Where there is a waiver of a Constitutional right, the government must demonstrate that the waiver was voluntary, knowing, and intelligent. See generally, Minnick v. Mississippi, 498 U.S. 146, 160, *citing*, Johnson v. Zerbst, 304 U.S. 458, 464 (1038); See also, Michigan v. Jackson, 106 S.Ct. 1404 (1986). Furthermore, the Supreme Court has held that the courts must "indulge every reasonable presumption against waiver". Brewer v. Williams, 430 U.S. 404 (1977). Ms. Leonard submits that she was not effectively advised that she had a 5th Amendment right not to answer questions which would incriminate her, and the failure to do so requires that the statements be suppressed at trial.

19. Defendant respectfully requests a hearing on this motion.

9

WHEREFORE, for the above reasons, and any additional reasons adduced at a hearing on this matter, defendant respectfully moves this Court to suppress all statements allegedly made to prosecutors, law enforcement officers, and the grand jury on or about July 26, 2005.

                                       Respectfully submitted,

                                       /s/
                                       Howard B. Katzoff
                                       717 D Street, N.W., Suite 310
                                       Washington, D.C. 20004
                                       (202) 783-6414
                                       CJA Counsel for Thelma Leonard

## **CERTIFICATE OF SERVICE**

I hereby certify that this   31st   day of   May  , 2006, a copy of the foregoing Motion to Suppress Statements and Points and Authorities was electronically served upon Daniel Petalas, Esquire and Ann Brickley, Esquire, Public Integrity Section, United States Department of Justice, 1400 New York Avenue, N.W., Washington, D.C. 20005, and to all defense counsel of record.

                                       /s/
                                       Howard B. Katzoff